**MR. J., et al.**

v.

**BOARD OF EDUCATION, et al.**

Nos. 3:98CV1502(RNC), 3:98CV1531(RNC).

United States District Court, D. Connecticut.

March 29, 2000.

# I. PROCEDURAL HISTORY

This is a consolidated action comprised of two cases that the plaintiff filed against the West Hartford Board of Education ("Board"), Alexander Nardone, who is the Director of Special Education for the Town of West Hartford and David P. Sklarz, the Superintendent of the West Hartford Schools. Both cases arise from an ongoing dispute concerning the plaintiff's son, "A." The central question in the litigation is whether the Board has provided A. with a free appropriate education in the least restrictive environment as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.

In the first case, docket number 3:98cv1502(RNC), the plaintiff appeals from a decision of an administrative due process hearing officer. The gravamen of the appeal is that the administrative hearing officer exceeded his authority in enforcing a settlement agreement.

In the second case, docket number 3:98cv1531 (RNC), the plaintiff seeks reimbursement for attorneys' fees and costs that he incurred in connection with the due process hearing.

Dwight Schweitzer, W. Hartford, CT, for Plaintiff.

Susan Freedman, Shipman & Goodwin, Hartford, CT, for Defendant.

CHATIGNY, District Judge.

After review and absent objection, the recommended ruling is hereby approved and adopted.

## RECOMMENDED RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MARTINEZ, United States Magistrate Judge.

Pending before this court are cross motions for summary judgment. For the reasons that follow, the undersigned recommends that the plaintiff's Motion for Summary Judgment (doc. # 43) be GRANTED in part, DENIED in part and the defendants' Motion for Summary Judgment (doc. # 40) be GRANTED in part, DENIED in part.

## II. STATUTORY FRAMEWORK

Under the Individuals with Disabilities Education Act ("IDEA"), states that receive federal funding must provide disabled children with a "free appropriate public education." See 20 U.S.C. § 1412(a)(1). The "free appropriate public education" must include "special education and related services" that are tailored to meet the unique needs of each disabled child. See 20 U.S.C. 1401(a)(18). The IDEA defines "free appropriate public education" as one that provides "personalized instruction with sufficient support services to permit the child to benefit educationally from instruction" that is "formulated in accordance with the requirements of the Act." Board of Educ. of Hendrick Hudson Central School Dist. Westchester county v. Rowley, 458 U.S. 176, 203–04, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). A school

district must provide as the "basic floor of opportunity ... access to specialized services which are individually designed to provide education benefit to the handicapped child." *Rowley,* 458 U.S. at 203, 102 S.Ct. 3034.

States must also ensure that when possible, disabled children are "mainstreamed" in the "least restrictive environment." *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 132 (2d Cir.1998). In other words, disabled children must be "educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). States must take care "that special classes, separate schooling or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

To comply with the IDEA, the state must determine the particular educational needs of each child and create an individual education plan ("IEP") which details the services to be provided to the child. *See* 34 C.F.R. §§ 300.343–.345. The IEP is designed by the student's Planning and Placement Team ("PPT"). *See* Conn. Gen. Stat. § 10–76ff. The team is comprised of the student's parents and representatives of the teaching, administrative and pupil services staff. *See* 34 C.F.R. §§ 300.344.

Parents who are not satisfied with their child's IEP may request an impartial due process hearing before the state educational agency. *See* Conn. Gen.Stat. § 10–76h. After the state educational agency issues a ruling, the parents may bring suit in state or federal court to review the agency's opinion. *See Rowley,* 458 U.S. at 206–207, 102 S.Ct. 3034; *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1120 (2d Cir.1997). The agency's decision is subjected to an independent judicial review. *See Rowley,*

458 U.S. at 206, 102 S.Ct. 3034. This court may not, however, substitute its own notion of educational policy for that of the school authorities. *See id.* "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of education policy." *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 129 (quoting *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034)(internal quotation marks omitted). "A court will fashion appropriate relief based upon its assessment of a preponderance of the evidence developed in the administrative proceedings...." *Id.* at 122.

## III. *FACTS* [1]

The plaintiff's son, A., was born on October 16, 1983. (Board's Ex. 1). When he was 3½ years old, A.'s parents consulted a psychiatrist, Dr. James Black, because A. had behavioral problems. Dr. Black diagnosed A. with attention deficit hyperactivity disorder ("ADHD") and placed him on Ritalin. (Board's Ex. 3 and 4).

A. has attended a number of schools, both public and private. When he was four years old, A.'s parents placed him in the kindergarten class in the Bloomfield Early Education Program, a part of the Bloomfield Public School System. (Tr. 11/14/97, p. 134). The next school year, 1989–90, A. repeated kindergarten at the Renbrook School, a private day school selected by A.'s parents. He attended the Renbrook school for two years. (Tr. 11/14/97, pp. 139–140).

For the 1991–92 school year, A.'s parents removed him from Renbrook and placed him back in the Bloomfield Public School system. (Tr. 11/14/97, p. 142). In December of his second grade year, A. was

---

1. These undisputed facts are taken from the administrative record and from the parties' D. Conn. L. Civ. R. 9(c)1 statements (doc. #42, 45). The plaintiff submitted an affidavit (doc. #46) which provides the basis for much of the version of the statement of facts in the plaintiff's brief. That affidavit was stricken by order dated today.

referred to a PPT so that his need for special education could be assessed. The PPT recommended that an educational evaluation be performed. (Board's Ex. 11). The evaluation was conducted in January and February of 1992. Testing revealed a severe discrepancy between A.'s achievement and ability. (Board's Ex. 12).

In January 1992, A.'s parents began divorce proceedings. A.'s father reported that the divorce was hard on A. and caused him to feel more alienated and less secure. (Tr. 11/14/97, p. 157).

A.'s PPT met on February 18, 1992 to review the results of the evaluation. The PPT concluded that A. had a learning disability and required special education. The PPT recommended that A. be placed in a "resource room" for 2.5 hours a week, with the remainder of A.'s day to be spent in regular education. (Board's Ex. 17).

A. attended school in the Bloomfield Public School system for the remainder of his second and third grade years. (Tr. 11/14/97, pp. 146–47).

In 1993, when A. was in the fourth grade, he and his younger sister moved with their father to West Hartford. (Tr. 11/14/97, p. 148). The PPT recommended placement in the West Hartford Public School system.

At the beginning of A.'s fourth grade year, his school psychologist asked A.'s parents to meet with the Board's psychiatric consultant, who happened to be Dr. Black, the same psychiatrist who had been treating A. since he was 3½ years old. (Board's Ex. 39). In a report dated October 2, 1993, Dr. Black opined that A. was "experiencing a combination of clear-cut Attention Deficit features as well as pervasive authority testing, narcissistic posturing, non-compliance and general oppositional defiance of a passively resistant nature." (Board's Ex. 40). He recommended that A. continue in his placement in the West Hartford Public School system and continue with psychotherapy, with a focus on A.'s narcissistic sense of entitlement, his defiance of authority and self-esteem issues. (*Id.*) Dr. Black further recommended that A.'s parents and teachers provide him with a clear-cut structure and impose stricter adult controls. (*Id.*)

On November 15, 1993, A.'s PPT convened and asked A.'s father for his consent to conduct evaluations of A.'s intelligence, personality and behavior. (Board's Ex. 45). A.'s father consented and in January 1994, Todd Fine, the school psychologist, conducted the evaluation. (Board's Ex. 49). He noted that A. was a "loner," that he avoided group activities and that his transition into the West Hartford school had been difficult. (*Id.*) Mr. Fine reported that A. was capable of completing basic math and English assignments, but that his efforts were erratic, he was unfocused and had increasing behavioral problems in school. (*Id.*) Tests revealed that "there was a statistically significant difference between A.'s verbal and performance scores." (*Id.*) Additional testing revealed that A. was "an anxious, passive/aggressive boy" who "evidenc[ed] some underlying depression and has serious parental issues to resolve." (*Id.*) The evaluation confirmed the earlier finding that A. had a learning disability and a manipulative style of interaction with adults and peers. (*Id.*) The psychologist recommended that the evaluation be provided to the PPT so that an appropriate educational program could be designed, that A.'s family pursue counseling, and that the school provide A. with support to help him deal with social skills and behavioral issues. (*Id.*)

Another PPT meeting was convened on June 13, 1994. A.'s progress was discussed. The PPT learned that A. was engaging in behavior to avoid school work and that he appeared frustrated and unhappy. The PPT recommended that A. move into the fifth grade with continued special education support. The plan called for 1½ hours per week of resource room support and close monitoring of A.'s behavioral and emotional progress. (Board's Ex. 56).

A.'s parents were disappointed by A.'s fourth grade year and were concerned about his progress. (Tr. 11/14/97, pp. 159–160). The.next year, when he was 10 and in the fifth grade, A.'s parents sent him to Rumsey Hall,[2] a private boarding school in Washington, Connecticut. (Tr. 11/14/97, pp. 159–160).

A. quickly experienced problems at Rumsey. He did not do his school work and often got into fights with the other school children. He complained that the other children were picking on him and he refused to take responsibility for his actions. (Tr. 11/17/97, p. 50). In February 1995, Rumsey officials notified A.'s parents that A. would be asked to leave if the problems continued. (Board's Ex. 66). A.'s parents agreed to take A. home every weekend and arranged for him to see a psychiatrist, Dr. Ewing. Dr. Ewing prescribed Prozac to alleviate A.'s depression and increased his dosage of Ritalin to address his AHDH. A.'s problems at Rumsey continued, however, and he was dismissed from Rumsey Hall in April, 1995. (Tr. 11/17/97, pp. 55–57).

A. stayed at home with his father and received home based tutoring for the remainder of the school year. He did not receive any special educational services during this time. A.'s father began working at home so that he could supervise A. (Tr. 11/17/97, pp. 57–58).

The next year, when A. was 11 years old and in the sixth grade, his parents enrolled him in King Philip Middle School in the West Hartford Public School system. A.'s parents did not tell the school administrators that A. was in need of special educational services. (Tr. 11/17/97, pp. 57–60).

During his first week of school at King Philip, A.'s teachers asked to meet with A.'s father because they felt A. was not functioning properly and came to school "unkempt and dirty." The next week, A.

brought a knife to school. A. was suspended and the Board threatened expulsion. (Board's Ex. 60–63).

A PPT meeting was held on September 14, 1995 to discuss A.'s suspension. It was agreed that A. would be further evaluated in an effort to design an appropriate educational program for him. Glenn McGrath, the Board's Director of Special Education, recommended that additional psychological, educational, behavioral and personality evaluations be conducted. He further recommended that Dr. Black be consulted for an updated consultation and that A. be provided with home instruction pending the evaluations. (Board's Ex. 68).

A.'s parents objected to A. being placed at home and asked the PPT to consider a residential placement. Mr. McGrath told A.'s parents that Board policy did "not permit residential placement of a child like A." The Director explained that the Board placed only two children at residential facilities and they were both profoundly disabled. (Board's Ex. 66).

On September 15 and 18, 1995, the school psychologist, Frank Marisano, Ed. P., evaluated A. Test results contradicted A.'s 1994 evaluation. Dr. Marisano explained that the discrepancy was attributable to A.'s fluctuating attitude, attention and effort. He felt that A.'s true level of intellectual functioning was underestimated. Personality testing revealed that A. had low self-esteem, suffered from feelings of isolation and that he was stubborn, manipulative and often avoided responsibility. Dr. Marisano opined that A. was experiencing significant problems in emotional and behavioral functioning as well as anxiety and depression. He exhibited symptoms of self-esteem deficiency and had marked difficulties in interpersonal adjustment and relationships. Dr. Marisano recommended individual therapy and placement in a highly structured setting. In addition, a systematic program of interven-

**2.** Rumsey Hall is a non-special education residential preparatory school. (Tr. 11/17/97, p. 44).

tion to address his learning and behavioral needs was necessary. Dr. Marisano recommended positive reinforcement to build A.'s self-esteem and trust. He also suggested that a comprehensive educational evaluation be conducted in "more conducive circumstances." Further intellectual evaluation would be needed in another year to clarify A.'s actual functioning levels. (Board's Ex. 70).

A. was again evaluated by Dr. Black on September 19, 1995. In his report, Dr. Black noted that A. suffered from attention deficit disorder, had a long history of oppositional defiance and that he had a narcissistic view of the world. Dr. Black opined that A. was not capable of receiving a satisfactory education in a mainstream setting because he was likely to be a provocateur and to engage in conduct that put himself and/or others at risk. He suggested that A. be placed at a day treatment program and said that once A. achieved greater behavioral control, he would be able to focus better and to concentrate, thereby becoming a better candidate for a special education program in a public school. Family oriented psychotherapy was also recommended to address A.'s emotional and behavioral problems. Dr. Black did not feel that psychotherapy was necessary to A.'s educational programming, but that it was essential for his psychological well-being. (Board's Ex. 76).

A follow-up PPT meeting was held on September 19, 1995. The PPT noted that A. had a primary diagnosis of social and emotional maladjustment with a secondary diagnosis of a learning disability. The team concluded that A.'s possession of the knife was related to his disability and that the Board was therefore required to provide him with an alternative education program. The PPT recommended that he be placed in a small and highly structured therapeutic program. Several day treatment programs were discussed. The team suggested that A.'s parents visit each of the programs and decide which they preferred. (Board's Ex. 74).

A.'s parents visited two of the three suggested schools and decided to place A. at the day treatment program at the Woodstock School at Mt. Sinai Hospital. The Board agreed to pay the tuition costs for the educational component of the program but refused to pay for the therapeutic costs. A.'s parents submitted the bills for the therapeutic component to their insurance carrier, but it refused to cover the costs. A.'s parents told the Board that their insurance would not provide coverage for the expenses and the Board agreed to pay the therapeutic costs as well. (Board's Ex. 84, 86).

A.'s transition into the Woodstock School was difficult. Between October and February, he received five in-school suspensions and one out-of-school suspension. One of the in-school suspensions was ordered after a staff member found a pornographic magazine in A.'s possession. The out-of-school suspension was ordered when A. brought a cap gun to school.

Woodstock school staff reported that A. exhibited a lack of motivation and further testing revealed that he functioned one to three years below his grade level. Woodstock personnel felt that A. required an intense behavior modification program and that daily contact between home and school should be established. (Board's Ex. 90).

A.'s PPT met on December 21, 1995 to discuss his progress. At that time, his grades were close to failing and his behavior was "apathetic," "oppositional," and "resistant." The PPT did not recommend any significant changes to A.'s educational plan. (Board's Ex. 94).

The PPT reconvened on January 22, 1996 to further discuss A.'s social and behavioral progress and to determine whether modifications to his IEP were necessary. The PPT recommended that A. continue his placement at Woodstock but that he be searched daily to discovery if he was hiding contraband items such as

the pornographic magazine or cap gun. (Board's Ex. 97).

A.'s poor performance continued. On April 30, 1996, A.'s parents met with Woodstock School staff and agreed to modify his treatment plan. It was determined that if A. received three time-outs during the course of a school day, he would be sent home immediately to face a significant consequence. A.'s parents also agreed to visit the Woodstock School at random and spend the day sitting at the back of A.'s classroom. A. would be given homework every day, so that there would be no question as to whether he had homework on any given day. Failure to do homework would result in severe consequences at both home and school. A Woodstock School staff member would call at least once a week to discuss A.'s performance. (Board's Ex. 100).

A PPT report dated June 7, 1996 states that

A. is failing all of his subjects with the exception of language arts. . . . Socially and behaviorally, A. presents as oppositional, narcissistic, negative and provocative. He has very low self-esteem and self-isolates.

The PPT recommended that A. withdraw from Woodstock and that his parents place him in a program with a stronger emphasis on behavioral problems. (Board's Ex. 117).

A.'s parents were displeased with the Board's plan and explored the option of placing him at a private residential school. A.'s parents sought a residential school with a "closed system" which would not allow A. to manipulate situations. The Board did not help with their search. (Board's Ex. 117).

At some point before A.'s seventh grade year, A.'s father unilaterally placed him at Devereux Glenholme, a private residential facility in Washington, Connecticut. (Board's Ex. 129).

A.'s father hired an attorney, Alyce Raboy.[3] By letter dated August 28, 1996, Attorney Raboy notified the Board's Superintendent of Schools that A.'s parents disagreed with the Board's recommendations and wanted A. placed in a residential facility. (Board's Ex. 123).

On or about September 17, 1996, A.'s parents and the Board agreed to mediate their dispute instead of proceeding to a due process hearing. (Board's Ex. 127). The parties met for mediation on October 21, 1996. No agreement was reached that day, but the parties continued to negotiate through their lawyers. An agreement eventually was reached. The Board's attorney drafted a written memorandum which reflected the agreement.

A.'s father, who is an attorney who has practiced law since 1968, signed the agreement on December 27, 1996. The Board's representative signed it on January 7, 1997. The agreement provided, *inter alia*, that

the district agrees to assume responsibility for the education and clinical program for [A.] at Devereux Glenholme for the 1996–97 school year. Such costs are estimated at $32,000 . . . The district will reimburse the Parents in the amount of $3000.00 in attorney's fees within 30 days of the date of the signing of this Agreement in full and complete settlement of all costs, fees and/or damages in this matter. . . .

(Board's Ex. 135). A.'s parents agreed to pay the costs of the residential portion of the Devereux tuition. The settlement agreement further provided

"This Agreement is in full and final settlement of all issues which were raised or could have been raised in a due process hearing through the 1996–97 school year. . . . Both the Parents and the district have been represented by counsel experienced in this area of the law and

---

**3.** Attorney Raboy is now known as Alyce Alfano. For consistency, she will be referenced to as Attorney Raboy throughout this recommended ruling.

understand the full force and effect of this agreement."

(*Id.*)

A Board representative wrote to Devereux on January 24, 1997 and confirmed that the Board agreed to pay the educational and therapeutic costs for A.'s placement for the 1996–97 school year. (Board's Ex. 134).

A. attended Devereux Glenholme for the 1996–1997 year, his seventh grade year. He passed all of his subjects and functioned at a sixth grade level. Devereux staff reported that A. continued to need a highly structured and therapeutic program.

A PPT meeting was held on May 1, 1997. At the meeting, the Board agreed to pay for the tuition costs of the educational and instructional components (but not the residential component) at Devereux Glenholme for the 1997–98 school year. (Board's Ex. 138). During the summer of 1997, A. participated in an extended year program at Devereux. The Board again agreed to pay only the educational costs of the summer program. A. re-enrolled at Devereux Glenholme for his eighth grade year, 1997–98. (Board's Ex. 138–145).

At a PPT meeting on October 3, 1997, Devereux staff reported that A.'s academic progress had been modest and he still needed 24 hour support. He was functioning at the lowest level of the behavior modification system utilized at Devereux and continued to display a lack of motivation and an unwillingness to accept responsibility for his actions. He was disrespectful towards adults, refused to follow rules and directions and did not complete his homework. (Board's Ex. 148).

The PPT recommended that the Board pay only the educational component of the Devereux costs. A.'s parents disagreed and asked the Board to pay the educational *and* residential costs. (Board's Ex. 147).

On or about October 7, 1997, A.'s father wrote the Due Process Unit at the State Department of Education and requested a Due Process Hearing. As relief, he sought a finding that the residential treatment program at the Devereux Glenholme School was the appropriate placement in the least restrictive environment for A. He also sought an order requiring the Board to pay the full cost of A.'s placement, not just the educational and therapeutic components. (Admin. Record Ex. 1).

On October 17, 1997, A.'s father filed his prehearing statement of issues:

1. Did the Respondent provide to the Complainant an appropriate free public education for the academic year 1995–1996. . . .

2. Did the Respondent provide to the Complainant . . . an appropriate free public education for the academic year 1996–97. . . .

3. Did the Respondent offer the Complainant an appropriate free public education for the 1997–1998 academic year. . . .

4. Did the Respondent give the Parents of the Complainant the required Notice of their Rights pursuant to State and Federal [statutes] prior to the PPT meeting of October 3, 1997 as their child was the recipient of Special Education services from the Respondent, and was entitled to a notice of their rights as "Parents who had placed their child in Private School without the consent or referral of the [Board] as Respondent had not made a free appropriate public education available to the child in a timely manner prior to that enrollment."

(Admin. Record Ex. 7).

On October 20, 1997, Hearing Officer Pepyne held a prehearing conference. After the conference, the plaintiff filed a revised statement of issues. The revised statement was nearly identical to the prior statement, but in the revised statement, the plaintiff indicated for the first time

that he was seeking to avoid the settlement agreement and was seeking reimbursement of the costs of A.'s placement from the fall of 1996 forward. (Admin. Record Ex. 8).

On November 10, 1997, the Board filed a Motion in Limine to Enforce Settlement Agreement. The Board argued that the plaintiff was precluded from offering evidence concerning A.'s placement for the 1996–97 school year in light of the settlement agreement. It asked that the hearing officer render his decision on the issue as a matter of law and argued that it was not proper to consider parol evidence. The plaintiff opposed the motion and advised Hearing Officer Pepyne that he, along with Attorney Raboy, intended to testify about factual issues surrounding the execution of the settlement agreement.

In or around November, 1997, the plaintiff retained Attorney Roger Bunker as "co-counsel." (Admin. Record Ex. 10).

On November 5 and 6, 1997, the Board's psychologist, Dr. Marisano, evaluated A. again. As he concluded during A.'s sixth grade year, Dr. Marisano recommended that A. be placed in a highly structured day treatment program. (Board's Ex. 160).

A due process hearing was held over the course of several days. The parties adduced evidence concerning the validity of the settlement agreement. The plaintiff testified as to his recollection of the mediation and the circumstances surrounding the settlement agreement. (Tr. 11/14/97, pp. 35–69). He testified that Attorney Raboy would corroborate his version. (Id. at 124). Attorney Raboy, however, refused to attend the hearing voluntarily. The plaintiff subpoenaed her and she appeared at the hearing but did not testify. (Tr. 1/13/98, pp. 16–17).

Various educators and experts testified at the hearing. Dr. Cherkes–Jukowski, the parents' educational consultant, testified that A. has a learning disability and attention deficit disorder. She noted that A. was beginning to demonstrate the rudiments of self-regulation, but that he needed additional assistance. She recommended that A. work in a close apprentice-like relationship with a teacher and gradually receive increasing amounts of responsibility. In addition, she recommended that A.'s teachers encourage him to use his own language to paraphrase and to elaborate. A. also needed intensive and highly individualized math instruction. Dr. Cherkes–Jukowski felt that A. would not be able to develop sufficient self-esteem and self-control until he began to achieve success in academics. She also opined that further evaluations were necessary to assess A.'s language skills. (Tr. 12/22/97, pp. 11–70).

Dr. Cherkes–Jukowski testified that the instruction at Devereux Glenholme was not quite right for A.'s needs, but during his time there, he exhibited an increased reception to instruction and learned the rudiments of self-regulation. (Tr. 12/22/97, p. 66). She opined that A. should remain at Devereux Glenholme. (Id. at 68). She stated,

> right now [A.'s] behavioral difficulties are going to interfere with his life more than anything else and that most definitely has to be addressed.

(Id.)

Dr. Black testified that A.'s oppositional behavior continued. He blamed A.'s behavior on inconsistent parental control, a lack of supervision while at home, and because he lacked "powerful identification" with his parents. (Tr. 1/20/98, pp. 35–36).

David Russell, Ph.D., testified at the hearing and submitted a summary of his testimony dated January 7, 1998. Dr. Russell assessed the adequacy of A.'s placement at the Devereux Glenholme School. His summary states,

> the program at Devereux provides a highly structured and highly integrated 24–hour program. This has provided a level of structure and consistency that has not been present in any of his previ-

ous placements. This rigorous and comprehensive approach has begun to reap rewards in a notable decrease in his oppositionality and manipulativeness. Even with this level of structure [A.] continues to show some difficulties and has only slowly begun to be able to focus on his academic weaknesses. At this point, a full residential program appears to be the minimum level of intervention that can adequately address his oppositionality, tendency to manipulate, and lack of self-control skills so that he can begin to benefit from academic interventions. It appears clear that any reduction in the level of continuous structure or consistency would adversely impact his education. Hence I recommend that he continue in his residential placement.

(Parents' Ex. 16).

After the due process hearing, the plaintiff filed a post-hearing statement of issues:

1. Did the [Board] offer [A.] an appropriate education for the 1996–97 school year?

2. Did the Devereux Glenholme School provide [A.] with an appropriate education in the least restrictive environment during the September 1996–June 1997 school year?

3. Does the "Settlement Agreement" preclude reimbursement to [A.'s] parents for the September 1996–June 1997 school year?

4. Did [A.] require placement for educational reasons at Devereux Glenholme for the summer of 1997?

5. Does [A.] require placement for educational reasons at Devereux Glenholme for the 1997–98 school year now in progress?

6. Did the Board violate [A.'s] and his parent's procedural rights by consistently refusing to advise them of [A.'s] right to a free education in a residential placement, if necessary to benefit from his education, and of the procedures and criteria for determining such a need and securing it?

In his written decision, the hearing officer framed the issues as follows:

1. Did the Board offer [A.] a free appropriate public education (FAPE) during the 1996–97 school year?

2. Is the parent estopped or otherwise barred from raising issue # 1 by reason of a prior agreement between the parties?

3. Did [A.] require a residential program for educational reasons during the summer of 1997?

4. Is the program being provided by the Board for the 1997–98 school year appropriate to meet [A.'s] needs, or does he require residential placement for educational reasons?

(Admin. Record Ex. 31).

The hearing officer found in favor of the Board on issues 1 and 2, and in favor of the plaintiff on issues 3 and 4. The hearing officer held that A.'s father was barred from litigating the issue of whether or not the Board offered A. a free appropriate public education for the 1996–97 school year because of the parties' settlement agreement. With regard to the enforceability of the settlement agreement, Hearing Officer Pepyne wrote,

In the present case the terms of the parties['] settlement appears clear and unambiguous: the Board agreed "to assume responsibility for the educational and clinical program for [A.] at Devereux Glenholme for the 1996–97 school year." The Board did that and paid Devereux. It was further agreed that the Board will "reimburse the Parents in the amount of $3000.00 in attorney's fees within 30 days of the date of the signing of this Agreement." The evidence indicated that the Board did this as well. These payments by the Board, it was agreed, were "in full and complete settlement of all costs, fees and/or damages in this matter ...." The parent later focused on the statement in the agreement

regarding the Devereux costs which reads, "Such costs are estimated at $32,-000 . . . ." arguing that $32,000 was the precise amount the Board must pay either to Devereux or to him. The actual cost of A.'s education and clinical program at Devereux was close to but not quite $32,000. The parent argues therefore that the agreement is void by reason of mistake. This hearing officer disagrees. The parent's interpretation of the settlement agreement is unreasonable and without merit. Therefore, it must be concluded that the settlement agreement should be enforced within the plain and ordinary meaning of its terms and conditions. Hence, the parent is precluded by that agreement from attempting now to litigate issues he could have litigated at that time but for his assent to the settlement agreement. Viewed prospectively, as of the time of it[s] execution, the agreement appears fair and equitable to each of the parties for the 1996–97 school year.

(Admin.Record, Ex. 31, pp. 18–19).

· The hearing officer further concluded that A. required residential placement for the summer of 1997 and the 1997–98 school year. With regard to A.'s placement in a residential facility, Hearing Officer Pepyne found that:

A. is a severely disabled child whose condition has deteriorated during his school career. Undoubtedly, dysfunctional family life, divorce, and inappropriate private and public school placements, among other factors, have exacerbated his emotional disturbance. The issue to be resolved here is whether A. required residential placement for educational reasons during the summer of 1997 and the school year 1997–98. An early special education case in Connecticut, *Papacoda v. State Board of Ed.*, 528 F.Supp. 68 [ (D.] Conn.1981), determined that a placement is for educational reasons when it is not possible to separate educational from non-educational rea-

sons due to the complexity of the case. In the present case it is impossible to separate A.'s educational needs from his psychiatric, emotional and social needs. A.'s emotional instability has so encroached upon his cognitive functioning that he has been unable to cope academically or focus on learning activities.

(Hearing Officer's Decision, Admin. Record Ex. 31, p. 12).

The hearing officer further found that

[t]he Board's response to A.'s placement needs has been unique. The Board enunciated as policy that residential placement will not be considered unless the child is so disabled that he needs constant supervision to function or is a danger to himself or others. This policy is not in accord with state or federal requirements for a Board to make available related services to enable a child to benefit from his special education instruction and to provide a suitable spectrum of placement options from the least to most restrictive environment.

(Id. at 12–20)

He further held that the Board was required to reimburse A.'s parents for the costs they incurred for A.'s placement at Devereux during that time. Finally, he ordered the Board to convene a PPT meeting to review A.'s status and to design an individual education plan ("IEP") for the summer of 1998 and the 1998–99 school year.

On June 30, 1998, the plaintiff appealed the hearing officer's decision to this court. On August 3, 1998, the plaintiff filed another action seeking reimbursement for attorneys' fees, expert witness fees and costs totaling $41,343.74. These suits were consolidated and are the subject of the pending motions.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

Because the plaintiff's motion for summary judgment (doc. # 43) and the defen-

dant's cross motion for summary judgment (doc. # 40) present essentially the same issues and arguments, they will be addressed together.

## A. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show that no material facts are in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the opposing party must come forward with specific evidence that demonstrates that there is a genuine issue of material fact to be resolved at trial. *Dusanenko v. Maloney,* 726 F.2d 82, 84 (2d Cir.1984); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether or not a fact is material, the court will examine the applicable substantive law, as "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

## B. DISCUSSION

### 1. Settlement Agreement

The plaintiff contends that the hearing officer did not have the authority to enforce the settlement agreement. In addition, he asserts that he was "fraudulently induced" into accepting the Board's settlement offer. Specifically, he asserts that he relied on the Board's false and fraudulent representation that it could not pay for educational placements in residential facilities for students who were not a threat to themselves or others and could care for

themselves. The plaintiff also claims mutual mistake. As the basis for this claim, he submits that he believed he would receive $35,000 as reimbursement for the expenses he already paid for the 1997–98 year at Devereux. In addition, the plaintiff claims that the settlement agreement must fail for want of consideration. He explains, "the Board, in agreeing to pay for the educational and therapeutic portions of [A.'s] placement at the Devereux School was only doing what [it] was obligated to do. [Its] offer to pay for the educational and therapeutic portion in exchange for the parents agreeing to pay the residential costs provided no consideration for the parents['] agreement to do so."

Each of these claims will be addressed in turn.

### a. Hearing Officer's Authority to Enforce the Agreement

The plaintiff first claims that the hearing officer lacked the authority to enforce the terms of the settlement agreement. The court disagrees.

The Second Circuit has not addressed the issue of whether a settlement agreement between the parents of a child requiring special education and a school board is enforceable. However, the Third Circuit, in *D.R. v. East Brunswick Bd. Of Educ.,* 109 F.3d 896 (3d Cir.1997),[4] held that such an agreement is enforceable so long as the agreement was voluntarily and willingly entered by the parties. In the *D.R.* case, the parents unilaterally placed their child, a student with multiple disabilities, in a residential program. A dispute arose over the funding for D.R.'s placement, and D.R.'s parents and the school board entered into a settlement agreement that provided that the board would pay $27,500 towards D.R.'s placement costs for the first year, then 90% of the increase over that rate for the following year. The

---

4. *See also Pascoe v. Washington Central School Dist.,* 29 IDELR 31 (S.D.N.Y. Sept. 29, 1998)(court noted in *dictum* that the parties' settlement agreement precluded judicial review of the 1994–95 school year).

agreement provided that the board was not responsible for other costs, related services or transportation. A few months after the agreement was signed, D.R.'s teachers determined that D.R. required the assistance of one-on-one aides. As a result, D.R.'s tuition doubled. D.R.'s parents asked the board to pay the additional sum; the board refused and argued that pursuant to the agreement, it was not required to pay for "related services" such as aides. D.R.'s parents requested a due process hearing and the administrative law judge held that the agreement was binding and the board was not liable for the costs of the aides. *See Id.* at 898–99. D.R.'s parents appealed the decision to the district court. The court held that the board was not liable for the additional costs unless D.R.'s parents could demonstrate that D.R.'s circumstances had changed such that the services being provided under the agreement no longer satisfied the IDEA. The matter was remanded for another due process hearing and the administrative law judge determined that D.R's circumstances had not changed and therefore the agreement was binding on the parties. D.R.'s parents again appealed to the district court. In ruling on the parties' cross motions for summary judgment, the district court found that D.R.'s circumstances had in fact changed since his parents signed the agreement. It held that because the one-on-one aides were educationally necessary, the board was required to pay for the services. The district court reasoned that because disabled students are statutorily entitled to educationally necessary services, D.R.'s parents could not contractually waive D.R.'s right to receive those services. *See Id.* at 899–900.

The Third Circuit reversed. It held that D.R.'s circumstances had not changed and that

the only circumstance that changed was that [D.R.'s school] decided that its staff could not maintain the level of individualized attention that D.R. was receiving at the negotiated price. The School de-

cided that additional help was needed to deal with D.R.'s unchanged condition, increasing the total cost of services provided by the school.

*Id.* at 900–01. In holding that D.R.'s parents were bound by the settlement agreement, the court reasoned

[o]nce a school board and the parents of a disabled child finalize a settlement agreement and the board agrees to pay a certain portion of the school fees, the parents should not be allowed to void the agreement merely because the total cost of the program subsequently increases. A party enters a settlement agreement, at least in part, to avoid unpredictable costs of litigation in favor of agreeing to known costs. Government entities have additional interests in settling disputes in order to increase the predictability of costs for budgetary reasons.

We are concerned that a decision that would allow parents to void settlement agreements when they become unpalatable would work a significant deterrence contrary to the federal policy of encouraging settlement agreements. *See McDermott Inc. v. AmClyde,* 511 U.S. 202, 114 S.Ct. 1461, 1468, 128 L.Ed.2d 148 (1994)("Public policy wisely encourages settlements.") Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the courts.... When the parties entered the settlement agreement at issue in this case, they entered a contract.

*Id.* at 901.

The court finds the Third Circuit's reasoning persuasive. Public policy dictates that settlement agreements should be enforced. *See ABKCO Music, Inc. v. Harrisongs Music Ltd.,* 722 F.2d 988–997 (2d Cir.1983). In keeping with this principle, the court concludes that a hearing officer may enforce the terms of a voluntary settlement agreement.

### b. Voluntariness

██ In addition to raising the issue of whether the hearing officer had the authority to enforce the agreement, the plaintiff contends that he did not voluntarily enter the agreement. Specifically, he claims that the agreement was induced by fraud. He also claims that it was based on mutual mistake and that it is void for want of consideration.

The Board counters that the hearing officer considered such arguments and rejected them. It maintains that the plaintiff failed to prove his claims during the administrative process and that the hearing officer's decision is supported by the evidence in the record. The court agrees with the Board.

The record reveals that the plaintiff raised these same issues at the administrative level. With regard to the enforceability of the agreement, the plaintiff testified on his own behalf. He testified that he thought the Board had agreed to reimburse him a total of $35,000 and that he would not have agreed to the settlement had he known the Board would pay less. The plaintiff told the hearing officer that Attorney Raboy's testimony was crucial to prove his claims and that her version would support his own. The hearing officer rejected the Board's request that he make a determination as to the validity of the agreement as a matter of law and not consider parol evidence. Upon the plaintiff's request, the hearing officer agreed to consider the plaintiff's testimony and to hear Attorney Raboy's testimony as well. Because she was unavailable to testify right away, the hearing officer deferred decision on these issues pending Attorney Raboy's appearance as a witness. Although Attorney Raboy appeared at the hearing, the plaintiff failed to call her to testify.

After consideration of the evidence before him, the hearing officer concluded that the terms of the settlement agreement were clear and unambiguous. He found that the Board agreed to pay for A.'s clinical and educational programs at the Devereux Glenholme school and that it fulfilled its obligation by making the payment. In addition, the Board paid A.'s father the attorney's fees as it agreed to do. The hearing officer expressly rejected the plaintiff's argument that the agreement was void by reason of mistake and that he was fraudulently induced into making the agreement.

The court has carefully reviewed the evidence and arguments of counsel that pertain to this issue and concludes that the hearing officer's decision should be given due weight. *See Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. The hearing officer's conclusion that the agreement is binding is supported by a preponderance of the evidence. *See Tolland Bd. of Educ. v. Connecticut Bd. of Educ.,* 1984–85 EHLR 556:412,417 (D.Conn.1985). Indeed, aside from the plaintiff's self-serving testimony, the record is devoid of any evidence to support of any the plaintiff's arguments.

### 2. Attorneys' Fees

### a. Prevailing Party

The IDEA provides that "in any action or proceeding under this subsection, the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents or guardians of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(e)(4)(B).

██ Under this provision, a party is deemed "prevailing" if he succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Texas State Teachers Assoc. v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 791–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In making this determination, a court must consider whether the plaintiff (1) obtained relief on a significant claim in the litigation; (2) whether the relief materially altered the parties' legal relationship; and (3) whether

the relief is more than *de minimis* in nature. *Id.*

The Board does not dispute the plaintiff's claim that he is the prevailing party and is therefore entitled to some level of reimbursement for attorneys' fees. Rather, the Board disputes the amount of fees to be awarded.

### b. Amount of Fees

Once a movant meets the "prevailing party" threshold, the district court must then determine a reasonable fee. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In general, courts apply the "lodestar" method to determine a reasonable fee. Under this method, courts first estimate the number of hours worked, excluding hours which are excessive, duplicative or unnecessary; second, the court must determine the prevailing hourly rate for attorneys of similar experience within the geographic region; and finally, the court multiplies the hourly rate by the number of hours allowed. *Blum v. Stenson,* 465 U.S. at 897, 104 S.Ct. 1541.

The plaintiff argues that he is entitled to the total amount of all attorneys' fees and costs. He claims that, based upon the prevailing market rate in the relevant market, Attorney Bunker should be compensated at a rate of $120 per hour.[5] He seeks reimbursement in the amount of $34,300.00 for approximately 286 hours of work. He also seeks reimbursement for $5245.50 in expert witness fees[6] and $234.24 in costs.

The Board claims that the amount of the plaintiff's request for fees must be significantly reduced because (1) the fees are excessive, (2) the plaintiff achieved only partial success, (3) the time records are inadequate, (4) the subpoena service cost was unnecessary and (5) expert witness

fees are not compensable and in any event, are excessive. Each of the Board's arguments will be addressed in turn.

### i. Excessive Fees

The defendant correctly states that the plaintiffs are not entitled to recover fees for "[h]ours that are excessive, redundant, or otherwise unnecessary...." *Kirsch v. Fleet Street Ltd.,* 148 F.3d 149, 173 (2d Cir.1998).

The court has carefully reviewed the time records in conjunction with the administrative record and finds that the time expended by Attorney Bunker was not excessive. The hearing, which took place over several days, was hotly contested and many difficult issues were addressed. Moreover, Attorney Bunker assisted A.'s father with post hearing motions and assisted in the filing of one of these federal actions. Therefore, a reduction on this ground is not warranted.

### ii. Fee Reduction Due to Partial Success

■ The Board argues that the amount of attorneys' fees should be reduced by 50% because the plaintiff achieved only partial success. The court disagrees that a 50% reduction is appropriate.

The Board argues that because the plaintiff achieved success on only two of the four issues he raised, he should only receive 50% of his requested fee. The court is not persuaded that such a reduction is warranted.

Although "the degree of the plaintiff's success is not determinative of eligibility for attorney's fees, it is relevant to the size of the award." *Chagnon v. Town of Shrewsbury,* 901 F.Supp. 32, 36 (D.Mass. 1995). Where a plaintiff achieves only

---

5. The Board does not argue that Attorney Bunker's hourly fee is unreasonable.

6. In his papers, the plaintiff states that he seeks $7575.50 in expert fees. The Board states that it has already reimbursed the

plaintiff $2330 for Dr. Cherkes–Jukowski's services. Therefore, the court will address only that portion which has not been reimbursed.

partial or limited success, the district court is vested with the discretion to reduce the award accordingly. *See id.; Hensley,* 461 U.S. at 437, 103 S.Ct. 1933.

As the Second Circuit remarked in *Grant v. Martinez,* 973 F.2d 96, 101 (2d Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993):

> The determination of the amount of the award does not end with the lodestar calculation. Although there is a "strong presumption' that the lodestar figure represents the 'reasonable' fee," *City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), other considerations may lead to an upward or downward departure from the lodestar. *See Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. The party advocating such a departure, however, bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee. *United States Football League v. National Football League,* 887 F.2d 408, 413 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990).

[The defendant] argues that the lodestar should have been adjusted downward to reflect appellees' limited success. In *Hensley,* 461 U.S. at 434–37, 103 S.Ct. 1933, the Supreme Court set forth an analytic framework for determining whether a plaintiff's partial success requires a reduction in the lodestar. At step one of this analysis, the district court examines whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which the plaintiff succeeded. The hours spent on such unsuccessful claims should be excluded from the calculation. *Id.* at 434–35, 103 S.Ct. 1933; 2 Martin A. Schwartz & John E. Kirkland, *Section 1983 Litigation* 276–77 (2d ed.1991). At step two, the district court determines whether there are any unsuccessful claims interrelated with the successful claims. If such unsuccessful claims exist, the court must determine whether

the plaintiff's level of success warrants a reduction in the fee award. *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933; [2 Martin A. Schwartz & John E. Kirlin, *Section 1983 Litigation,* 276–78 (2d ed.1991).] If a plaintiff has obtained excellent results, however, the attorneys should be fully compensated. *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

While it is true that the plaintiff failed to prevail on his claim that the settlement agreement was unenforceable and that the propriety of A.'s placement for the 1996–97 school year should be re-visited, a 50% reduction is simply not warranted.

The time expended on these issues is easily separable from the fee award. In his affidavit, Attorney Bunker states that

> [A]pproximately 19 hours were expended on the matter of defendant's motion in limine and the agreement concerning reimbursement for plaintiff's costs during his first year in private school as most of the work on those matters was performed by plaintiff's father. . . .

In addition, a review of the record reveals that the vast majority of time at the hearing was spent on the issue of whether A. required residential placement; the issues concerning the settlement agreement consumed only a fraction of the hearing. On November 14, 1997, the hearing officer heard argument and testimony regarding this issue; approximately 110 pages of the transcript concern the settlement agreement. The matter was discussed again on November 20, 1997 in about 30 pages of transcript. The matter was addressed again on December 3, 1997; about 18 pages of the transcript are devoted to a discussion of the settlement issue. On January 13, 1998, issues relating to the settlement agreement were discussed in one page of the transcript. The issue was argued again on March 6, 1998, the final day of the hearing. Four pages of the transcript relate to that argument.

Based on the foregoing, the court determines that a reduction of $2280 (19 hours

× $120/per hour) is appropriate. *See* Doc. # 47. Therefore, the undersigned recommends that the plaintiff's fee award be reduced by $2280.

### iii. Inadequate Time Records

■ The Board submits that the fee award should be reduced because the time records lack specificity. The court agrees that a small reduction is warranted.

A fee applicant bears the burden of providing documentation to prove that an appropriate amount of time was billed and expended at a reasonable hourly rate. Where a party fails to keep adequate records, courts do not award the full amount requested. *See, Mr. and Mrs. B. v. The Weston Bd. of Ed.,* 5 Conn. Ops. 182 (February 15, 1999) (Doc. No.3:97CV452) (Smith, M.J.). Vague entries such as "review of file," "review of correspondence," "research," "conference with client," and "preparation of brief" do not provide a court with an adequate basis upon which to evaluate the reasonableness of a fee application. *Id.; see also Connecticut Hospital Ass'n v. O'Neill,* 891 F.Supp. 687, 691 (D.Conn.1994); *Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510 (S.D.N.Y. 1994); *Orshan v. Macchiarola,* 629 F.Supp. 1014 (E.D.N.Y.1986). When time entries are lacking in this regard, courts typically apply an across-the-board reduction. *See id.*

After reviewing the time records submitted by Attorney Bunker, the court determines that the entries lack sufficient specificity and that a reduction is warranted. *See,* doc. # 47. Although the affidavit states only that "[d]uring [the relevant] period of time I expended 285 hours and 50 minutes on this matter including the filing of the Federal Complaint," the court has also considered Attorney Bunker's contemporaneous billing records. These records are considerably more detailed than the plaintiff's affidavit, yet they contain a number of vague entries. *See* doc. # 41. For example, the time entries for on ¹²⁄₁₇ through ¹²⁄₃₀ indicate only that Attor-

ney Bunker had phone conversations with several witnesses who testified at the hearing; the substance of the discussions is not revealed. *See id.* Other entries on 1/13 and 1/17 through 1/19 state only "hearing prep[aration]." Nevertheless, the court has carefully reviewed the contemporaneous time records as well as the administrative records and determines that the time billed is proportional to the work done. Accordingly, only a reduction of 5% is warranted. The undersigned recommends that the fee award be reduced by $1715.00.

### iv. Subpoena Costs

■ Next, the Board contends that it is not liable for $30.24 in costs for subpoena service. The cost was apparently incurred when the plaintiff subpoenaed Attorney Raboy to testify. The plaintiff does not respond to the defendant's argument that the cost should not be reimbursed. Because the plaintiff did not call Attorney Raboy to testify and he fails to establish the reasonableness of the expense, the award shall be reduced by $30.24. *See United States Football League v. National Football League,* 887 F.2d 408, 416 (2d Cir.1989)(attorney's fee award includes *reasonable* out of pocket expenses).

### v. Expert Witness Fees

■ There is a split of authority as to whether expert witness fees are recoverable under the IDEA. Several courts have concluded that they are. *See Bailey v. District of Columbia,* 839 F.Supp. 888 (D.D.C.1993); *Field v. Haddonfield Bd. of Educ.,* 769 F.Supp. 1313 (D.N.J.1991); *Arons v. New Jersey State Bd. of Educ.,* 842 F.2d 58, 62 (3d Cir.), *cert. denied,* 488 U.S. 942, 109 S.Ct. 366, 102 L.Ed.2d 356 (1988). Other court have concluded that they are not. *See Eirschele v. Craven County Bd. of Educ.,* 7 F.Supp.2d 655 (E.D.N.C.1998); *Cynthia K. v. Bd. of Educ. of Lincoln–Way High School Dist.,* 1996 WL 164381 (N.D.Ill., April 1, 1996). In reaching the conclusion that expert fees may not be recovered, the *Eirschele* court explained,

[c]ourts construing 20 U.S.C. § 1415's fee-shifting provisions have consistently relied on cases interpreting the fee-shifting provisions of 42 U.S.C. § 1988, which permits courts to award attorneys' fees to prevailing parties in civil rights litigation. *See Beard v. Teska*, 31 F.3d 942, 951 (10th Cir.1994). While no circuit court has ruled on the issue of whether expert witness fees are part of the "costs" listed in § 1415, the Supreme Court in *West Virginia Univ. Hosp. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), interpreted almost identical language in the former version of 42 U.S.C. § 1988 as failing to convey authority to shift expert fees.

*    *    *    *    *    *

After reciting a litany of statutes in which Congress had separately delineated provisions for recovering attorneys's fees and expert witness fees, the Court concluded that one term could not embody the other without rendering "dozens of statutes referring to the two [ ] separately an inexplicable redundancy." *Id.* at 658.

The undersigned declines to follow the *Eirschele* decision. Although it is well-reasoned and thoroughly researched, the court is convinced that Congress intended for prevailing parents to recover expert fees as part of their costs. The legislative history provides in part,

> [t]he conferees intend that the term "attorneys' fees as part of the costs" include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the case.

H.R. Conf. Rep. No. 99–687, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 1798, 1808. Any other result would be unjust.

The Board next argues that Dr. Russell's fees of $5245.50 are excessive and should be reduced. In support of this claim, the Board submits that Dr. Russell's assessment was markedly less thorough than that performed by Dr. Cherkes–Jukowski. Dr. Cherkes–Jukowski's bill was only $2330, less than half of Dr. Russell's fee. The Board points out that Dr. Russell did not conduct a psychological exam but only reviewed materials that were gathered by others and interviewed several people close to A. His written report, entitled "Summary of Testimony," is 3½ pages long, as opposed to Dr. Cherkes–Jukowski's 17 page report. Moreover, he testified for only a short time; approximately 80 pages of the transcript cover his testimony. In addition, the hearing officer questioned the value of Dr. Russell's work. *See* Tr. 1/13/98, pp. 8–9.

In light of the foregoing, the court recommends that a 50% reduction of Dr. Russell's fee be granted. Therefore, the court recommends a further reduction of $2622.75.

## V. *CONCLUSION*

The court concludes that the plaintiff's motion for summary judgment should be GRANTED insofar as he shall receive attorneys' fees and costs in the amount of $33,131.75. The remainder of his motion is DENIED. The Board's motion for summary judgment is GRANTED in that A.'s father is precluded from litigating the propriety of A.'s education for the 1996–97 school year and insofar as certain fees and costs shall be reduced in accordance with this ruling. The remainder of the Board's motion is DENIED.

Any party may seek the district court's review of this recommendation. *See* 28 U.S.C. § 636(b)(written objections to proposed findings and recommendations must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992) (failure to file timely objections to Magis-

trate Judge's recommended ruling waives further review of the ruling).

March 14, 2000.