103 F.3d 1114
 115 Ed. Law Rep. 324, 19 A.D.D. 750
 MRS. B., on her Behalf and as a mother and guardian of M.M.,
Plaintiff-Appellee,
v.
MILFORD BOARD OF EDUCATION and Mary Jo Kramer,
Superintendent of Schools, Milford Public Schools,
Defendants-Appellants.
 No. 1634, Docket 95-9110.
 United States Court of Appeals,
Second Circuit.
 Argued May 9, 1996.
Decided Jan. 10, 1997.
 
 Richard J. Buturla, Milford, CT (Marsha Belman Moses, Berchem, Moses & Devlin, P.C., Milford, CT, of counsel), for Defendants-Appellants.
 Anne L. Blanchard, Willimantic, CT (Douglas M. Crockett, Mary Jean Schierberl, Connecticut Legal Services, Inc., Willimantic, CT, of counsel), for Plaintiff-Appellee.
 Before: CARDAMONE, ALTIMARI and PARKER, Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Defendants filed this appeal from a final judgment entered in the United States District Court for the District of Connecticut (Squatrito, Judge ), holding them responsible for payment of all costs associated with plaintiff's daughter's placement in a private residential treatment facility under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. §§ 1401-1485. After exhausting her administrative remedies in a state due process hearing, plaintiff filed suit in district court pursuant to 20 U.S.C. § 1415(e)(2). Plaintiff claimed that defendants' refusal to pay all costs associated with her daughter's residential placement violated, inter alia, the IDEA in that it deprived her daughter, M.M., of a free public education appropriate for M.M.'s special needs. Plaintiff filed a motion for summary judgment, which the court partially granted. We affirm.
 
 I. BACKGROUND
 A. The Statutory Scheme
 
 2
 This case involves the nature of a state's obligations under the IDEA to pay for a child with emotional and educational disabilities to reside at a private treatment facility. The IDEA is "an ambitious federal effort to promote the education of handicapped children." Board of Educ. v. Rowley, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982) (interpreting the Education for All Handicapped Children Act ("EAHCA"), subsequently amended and renamed the IDEA). Such children include, among others, those with "serious emotional disturbance[s]" and "specific learning disabilities." 20 U.S.C. § 1401(a)(1)(A)(i); see also Rowley, 458 U.S. at 181, 102 S.Ct. at 3037-38.
 
 
 3
 To receive federal funds under the Act, a state must, among other things, put in place an approved plan to implement a "policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1), (2). A "free appropriate public education" must include "special education and related services" tailored to the individual needs of the child, pursuant to an individualized education program ("IEP"). Id. § 1401(a)(18). The IEP is a written program of instruction developed for the child by the local educational agency, the child's teacher, the child's parents or guardians, and, where appropriate, the child. Id. § 1401(a)(20).
 
 
 4
 The Act mandates that the "special education" developed for a child in an IEP must be "specially designed instruction, at no cost to parents or guardians, [that] meet[s] the unique needs of a child with a disability, including--(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." Id. § 1401(a)(16). The Act defines the "related services" that may be a necessary part of an IEP to include "transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education...." Id. § 1401(a)(17).
 
 
 5
 A child's parents must be notified regarding any proposed change in a child's educational program. Id. § 1415(b)(1)(C). If a child's parents are dissatisfied with an IEP, or anything related to the child's education, they may file a complaint with the state educational agency. Id. § 1415(b)(1)(E). Such complaints must be resolved at an "impartial due process hearing." Id. § 1415(b)(2), (c). Any party aggrieved by the outcome of the state administrative proceeding may bring an action in any state or federal court of competent jurisdiction. Id. § 1415(e)(2). A court reviewing the findings and conclusions reached in a state administrative proceeding must base its decision on the preponderance of the evidence, after reviewing the administrative record and any additional evidence presented. Id. § 1415(e)(2).
 
 
 6
 B. M.M.'s Disabilities and Educational Progress
 
 
 7
 M.M. is a seventeen-year-old girl who is eligible for special education services under the IDEA due to an identified learning disability. She has been enrolled in special education programs ever since her problems were first identified by her preschool teacher. M.M. also suffers from serious social and emotional problems that greatly impair her ability to learn. These problems include hyperactivity, an inability to interact with others, and lack of self-confidence.
 
 
 8
 Beginning in 1986, at the age of seven, M.M. exhibited distracted and erratic behavior. A psychologist observed that, although of average intelligence, M.M.'s ability to learn was seriously affected by emotional problems associated with her home-life and the death of her grandmother. The psychologist's report concluded that, beneath M.M.'s shy exterior, "[h]er inner-life is fraught with terrifying feelings of anger, fear, and sadness that go beyond her capacity to cope in a healthy way. These feelings lead to regressive behaviors, disinhibition of impulses, loss of contact with reality, and confused thought processes." The psychologist recommended therapy.
 
 
 9
 Subsequent evaluations of M.M. echo the 1986 report. In April of 1987, the IEP prepared for M.M. noted that, although she made some progress after 1986, she displayed little motivation and had poor self-esteem. The IEP concluded that M.M. would need a highly structured educational program. In the same year, the report prepared by M.M.'s Planning and Placement Team ("PPT") (the group, including M.M.'s mother, responsible for preparing M.M.'s educational program) recommended therapy for M.M. The IEP provided M.M. psychotherapy at the Milford Mental Health Center ("MMHC"), a community-based therapy center, as a service related to her special educational program.
 
 
 10
 In October of 1987, the IEP prepared for M.M. reported that she was beginning to initiate play and that her work habits were improving. The IEP concluded that M.M. was doing well in a structured educational environment, and would need continued emotional help, including activities to improve her self-esteem. This included ongoing counseling at the MMHC. The state agreed to pay for the costs of the MMHC family counseling for M.M. and her mother, but deleted psychotherapy from her educational program.
 
 
 11
 In 1988, MMHC evaluated M.M. and observed that she was emotionally immature but that her intelligence was "at least in the average range." M.M. showed signs of emotional growth and a tendency toward concretization in thinking. MMHC concluded that she would continue to need a highly structured educational environment. From September to November of 1988, M.M.'s IEP included psychological counseling at school, and family counseling at MMHC. M.M.'s December IEP did not provide for such services, however, and the state did not provide such services during 1989.
 
 
 12
 Unfortunately, M.M.'s emotional and educational progress remained halting at best. In 1989, M.M.'s IEP reported that she continued to suffer from a very poor self-image, had problems interacting with other children, and could not follow directions. The report also noted serious writing problems, stemming from M.M.'s tendency toward task-avoidance. As a result of these problems, the report recommended eliminating most written work from M.M.'s educational program.
 
 
 13
 Later that year, educational and psychological studies conducted by the Yale Child Study Center concluded that M.M. was very distractable and should be placed in a class with a small pupil-teacher ratio and students that are not disruptive or distracting. The psychological evaluation observed that, while M.M. scored in the average to slightly below-average intelligence range in most areas, she functioned at a social and emotional level inappropriate for her age. The psychological report described M.M. as having "many concerns, worries and fears about numerous aspects of her life" that lead her to withdraw in an attempt to avoid anxiety. M.M. would become overwhelmed by her surroundings, leading to regressive behavior and an inability "to problem solve effectively or to think clearly and logically."
 
 
 14
 In 1990, M.M.'s IEP again included therapy for M.M. at MMHC. In referring M.M. to MMHC, the areas of concern identified by the Board of Education included the need to determine an appropriate classroom placement for her due to her academic and social needs, M.M.'s problematic relationship with her mother, M.M.'s extensive need to seek adult and peer attention, and her dysfunctional social skills. This counseling lasted until May of 1991. Marcie Link evaluated M.M. at MMHC, serving as M.M.'s clinical social worker. She was also a member of M.M.'s PPT.
 
 
 15
 During her sessions with M.M. and Mrs. B., Mrs. Link determined that M.M.'s emotional problems could not be dealt with effectively outside a full-time residential treatment program. She reached this conclusion, in great part, due to Mrs. B.'s inability to deal with M.M.'s manipulative and regressive behavior. Mrs. Link recommended that M.M. be placed in a full-time private residential facility to provide M.M intensive behavioral treatment and therapy. Mrs. Link noted that during 1990 and 1991, M.M.'s "opposition and defiance" caused "both the family and teachers [to] become more easily frustrated." Mrs. Link believed that a residential setting was necessary to "provide structured and consistent limits and expectations while providing for the development of age appropriate social skills." Importantly, in recommending the residential placement, Mrs. Link wrote that her work with M.M. encompassed academic, social and personal problems, and that the placement was necessary to address "multi-faceted concerns." She did not believe such progress could be obtained through outpatient means.
 
 
 16
 Indeed, during 1990 and 1991, school records reflect that M.M. was not progressing in the special education program. Rather, her performance and behavior became worse, leading one of her teachers to remark that M.M. was "not producing or learning in our program". M.M.'s behavior in class became increasingly disruptive and regressive. In virtually all of her classes, she failed to meet basic academic and behavioral standards. During the PPT meeting in May of 1991, Mrs. Link recommended that M.M. be placed in a residential facility. She suggested that M.M. needed multidisciplinary coordination between the academic and therapeutic components of her special education program. Despite this recommendation, the Board did not agree to provide the placement. Instead, the IEP reflects that Mrs. Link would arrange the residential placement for M.M. through the Department of Child and Youth Services ("DCYS").
 
 
 17
 Prior to the placement, which was delayed for various reasons, including the death of M.M.'s father, M.M. continued to regress. She received unsatisfactory or failing grades in virtually all of her subjects throughout the year. Immediately prior to the placement, the IEP offered by the Board provided that M.M. would continue to be educated in a self-contained classroom of special education students, with weekly speech and language therapy sessions. The IEP did not provide for psychological therapy.
 
 
 18
 In August of 1992, M.M. began her residential placement, at the Devereux-Glenholme School ("Devereux"). The Board had no role in the placement. Rather, Mrs. Link coordinated the placement through DCYS. DCYS attached M.M.'s recently deceased father's life insurance proceeds to pay for the therapeutic portion of the placement. The state agreed to pay only for the educational component.
 
 
 19
 In October of 1992, a PPT meeting was held to develop M.M.'s educational plan. Following the meeting, the state referred M.M. to Yale for a second triennial evaluation. Yale conducted a psychological and educational evaluation of M.M. in January and February of 1993, shortly after M.M.'s placement in Devereux. While the educational evaluation concluded that M.M. had made "significant gains" in all academic areas since her previous evaluation in 1989, M.M.'s performance on the math portion of the Kaufman Test of Educational Achievement seriously regressed. M.M.'s percentile rankings increased in reading and spelling, but on different tests than were administered to her in 1989. Moreover, from 1989 to 1993, M.M.'s academic achievement grade levels increased only slightly, from 3.2 to 4.0 in reading, 2.8 to 3.5 in math, and 3.4 to 3.5 in english.
 
 
 20
 Both the educational and psychological evaluations conducted by Yale in 1993 recommended that M.M. be provided with a highly structured academic environment employing behavioral modification techniques. The psychological evaluation reported that M.M. had an unusual "orientation to fantasy" and would become easily overwhelmed by simple tasks. To address M.M.'s social, emotional and behavioral difficulties, the report concluded that M.M. should be provided with intensive therapy several time per week, as well as participation in a broad range of activities to focus on peer socialization.
 
 
 21
 Meanwhile, at Devereux, a program that provided M.M. with the highly structured setting recommended in the Yale evaluations, M.M. showed some progress. The Devereux program involved educational and residential life components. The educational component involved six hours per day of traditional schooling, where M.M. received instruction in a small classroom setting designed to provide her with positive reinforcement. After school, M.M. participated in a life skills program, where she received counseling from a social worker and worked with a small group of other children in a program designed to develop a positive self-image, resist negative peer pressure, and relate appropriately with others. After-school activities also included sports and the arts, activities intended to foster self-confidence and creativity. The academic and residential staff at the school worked together to improve student performance, reflecting the school's integrated approach to improving its students' academic and social skills.
 
 
 22
 While M.M. was at Devereux, M.M.'s PPT met and recommended that M.M. be transitioned back into a public school program. Mrs. B. agreed with this recommendation, but kept M.M. at Devereux for the rest of the year. The Board agreed to pay for the academic component of the Devereux program but not the costs associated with the school's residential component. The Board determined that M.M. had been placed in the program for counseling and behavior modification to respond to emotional and psychological problems, not for reasons related to her education. The Devereux school listed M.M. as a child admitted for non-educational reasons.
 
 C. The Administrative Due Process Hearing
 
 23
 The plaintiff initially did not object to DCYS, rather than the Board, arranging the residential placement partly at the plaintiff's expense. However, two months after the residential placement the plaintiff requested a due process hearing pursuant to 20 U.S.C. § 1415(b)(2) in order to force the Board to pay for the entire cost of the Devereux program. The hearing commenced on March 18, 1993.
 
 
 24
 The hearing officer found that M.M. had a lengthy history of difficulties in school, primarily rooted in social and emotional problems. He noted the effects of M.M.'s psychological distress on her academic performance, including the fact that immediately before M.M.'s placement at Devereux she had met only four of thirty-two objectives listed in her IEP. He also noted the findings of the 1989 Yale study, which concluded that M.M. required a structured special education setting with a small pupil-teacher ratio, close teacher proximity and supervision, and a behavior modification program. He cited the findings of Dr. Irving Newman and Dr. Fred Volmar, both of whom determined that M.M. was making good progress at Devereux. Dr. Newman testified that M.M. was doing exceptionally well in the program, both academically and socially. Dr. Newman determined that M.M. should remain in the program for the remainder of the academic year or part of the next year, before transitioning back into public school. Dr. Newman regarded the residential component as a large source of the Devereux school's benefit to M.M.
 
 
 25
 Finally, the hearing officer cited the 1993 Yale study, which concluded that M.M. continued to suffer from serious psychological problems. Yale recommended a highly structured special education setting, intensive individual and group therapy interventions, and participation in a broad range of activities focusing on peer socialization.
 
 
 26
 After recounting M.M.'s history of struggling to overcome educational and emotional problems, the hearing examiner concluded that M.M.'s placement at Devereux was necessary to help her get over her manipulative and "oppositional" personality. The hearing examiner determined that the program proposed by the Board upon M.M.'s return to the public school system was in many respects adequate for M.M.'s needs, but he added an important caveat:
 
 
 27
 [T]he Board would once again be dealing with a girl whose social and emotional problems are deeply rooted at home, problems which have been exacerbated by M.'s ability to manipulate her widowed mother into doing her bidding. With another year of successful behavior modification in Devereux's milieu--and another year to mature--M. should be able to be transitioned back to the Board's school, but not before September, 1994.
 
 
 28
 Despite concluding that M.M. should not be transitioned back into the school system before another year, the hearing officer determined that the Board did not have to pay for the full costs of M.M.'s residential placement at Devereux. The hearing officer put great weight on the evidence showing that DCYS arranged M.M.'s placement at Devereux, and that the Board and DCYS considered the placement to be for reasons unrelated to M.M.'s education. The hearing officer reasoned that "where predominately and significantly the child's problems grow out of the home situation rather than the school environment, the school cannot be taken to task." The hearing examiner concluded that M.M. was responsible for her failure to learn, apparently even if caused by her emotional problems, remarking: "Because much of the time M. willfully refused to drink at the fountain of learning does not mean that the fountain was not there or was not operable."
 
 D. The District Court Proceedings
 
 29
 Dissatisfied with the hearing officer's decision, plaintiff filed suit in district court pursuant to 20 U.S.C. § 1415(e)(2). Plaintiff moved for summary judgment, arguing that the Board was responsible for funding the residential placement. The court gave the parties an opportunity to submit additional evidence, but they chose to rely on the record from the administrative hearing. After reviewing the hearing officer's findings and conclusions, the magistrate judge, to whom the matter had been referred by the court, recommended that the court grant the motion.
 
 
 30
 The magistrate judge explained that he would base his decision on a preponderance of the evidence. Citing Rowley, he noted that he could not substitute his own notions of sound educational policy for those of the school authorities. In recommending summary judgment in favor of the plaintiff, the magistrate judge relied on a line of decisions that have considered whether school boards are responsible for residential placements in cases involving interrelated emotional and educational disabilities. Courts have held that "when the medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible for the costs of the residential placement." See Vander Malle v. Ambach, 667 F.Supp. 1015, 1039 (S.D.N.Y.1987) (citing cases).
 
 
 31
 Based on the hearing officer's findings and conclusions, the magistrate judge determined that M.M.'s educational and noneducational problems "are sufficiently intertwined such that her educational problems cannot be separated" from the non-educational ones. The magistrate judge also determined that the residential placement was necessary for M.M.'s educational progress, based on the hearing officer's conclusion that M.M. should not be immediately transitioned back into the public school system. After considering objections filed by the defendants, the district court adopted the report and recommendation in an endorsement order.
 
 II. DISCUSSION
 
 32
 In Board of Education v. Rowley, the Supreme Court explained that in reviewing an administrative decision under the EAHCA, now known as the IDEA, a district court must make a two-step inquiry: first, the court must consider whether the state has complied with the Act's procedural requirements; second, it must consider whether the IEP is "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 206-07, 102 S.Ct. at 3051. It is the second question that is at issue here. Accordingly, we must consider whether the district court justifiably concluded that M.M. was not receiving adequate educational benefit in the public school system. If so, we must consider whether the court properly ordered the state to reimburse the plaintiff for the entire cost of the residential placement.
 
 A. Educational Benefit
 
 33
 In an action challenging the adequacy of an educational placement under the IDEA, a trial court must "determine, based on a preponderance of the evidence," whether the educational program provided for a child is reasonably calculated to allow the child to receive educational benefits. Id. at 206-07, 102 S.Ct. at 3050-51. The court must give "due weight" to state administrative proceedings. Id. at 206, 102 S.Ct. at 3050-51. This court has previously explained that "[the Supreme Court's decision in] Rowley warns that 'courts must be careful to avoid imposing their view of preferable educational methods upon the States,' and that 'the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.' " Karl v. Board of Educ., 736 F.2d 873, 876-77 (2d Cir.1984) (quoting Rowley, 458 U.S. at 207, 206, 102 S.Ct. at 3051). While the Act does not authorize a court "to impose a particular substantive educational standard on the state or to require equality of opportunity for the handicapped in education," Karl, 736 F.2d at 876, a state IEP must be reasonably calculated to provide some "meaningful" benefit. See Rowley, 458 U.S. at 192, 102 S.Ct. at 3043-44.
 
 
 34
 While Rowley did not establish one standard for determining what constitutes meaningful educational benefit, the Court determined that such objective factors as "[t]he grading and advancement system" are important measures of acceptable progress. Id. at 203, 102 S.Ct. at 3049. The Court reasoned that
 
 
 35
 [c]hildren who graduate from our public school systems are considered by our society to have been "educated" at least to the grade level they have completed, and access to an "education" for handicapped children is precisely what Congress sought to provide in the Act.
 
 
 36
 Id. (footnote omitted). The Court noted that "[w]hen the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." Id. at 207 n. 28, 102 S.Ct. at 3051 n. 28. As other circuits have held, this standard contemplates more than "mere trivial advancement." Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 183 (3rd Cir.1988); see also Hall v. Vance County Bd. of Educ., 774 F.2d 629, 636 (4th Cir.1985) ("Clearly, Congress did not intend that a school system could discharge its duty under the [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial."). Of course, a child's academic progress must be viewed in light of the limitations imposed by the child's disability. See Rowley, 458 U.S. at 202, 102 S.Ct. at 3049 ("It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between.").
 
 
 37
 The Court in Rowley contrasted appropriate review under the Act, involving examining such objective evidence of progress as grades and test results, with impermissible meddling in state educational methodology. Id. at 203, 207, 102 S.Ct. at 3049, 3051. Under Rowley, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." Id. at 208, 102 S.Ct. at 3052. A court may not second-guess state educators' policy decisions in the effort to maximize a handicapped child's educational potential. Id. at 199, 206-07, 102 S.Ct. at 3047, 3050-51; Karl, 736 F.2d at 876.
 
 
 38
 In light of these standards, and the evidence of M.M.'s academic history, we believe the district court properly held that M.M.'s placement at Devereux was necessary for her to make meaningful progress. In so ruling, the district court gave due weight to the hearing examiner's conclusion that, because many of M.M.'s problems stemmed from her behavior and her home-life, she should remain in Devereux for the remainder of the 1993 school year.
 
 
 39
 M.M.'s history in the public school system before her placement at Devereux was marked by very limited academic progress, and serious regression in the year prior to the placement. She failed to meet nearly all of the objectives set in her IEP and nearly all of her grades were unsatisfactory. It is an inescapable fact that over the course of three years, despite being of average to slightly below-average intelligence, M.M. did not advance more than one grade level in any subject. In the face of M.M.'s decline, the Board offered no plan to deal with her worsening behavior, in spite of a clinical evaluation concluding that M.M.'s debilitating emotional problems could only be properly addressed in a highly structured residential setting. Based on the evidence of M.M.'s stalled academic performance, and the failure of the Board to deal with M.M.'s problems, the district court properly found that the residential placement was necessary.
 
 B. The Residential Placement
 
 40
 Having determined that the residential placement was necessary for M.M.'s educational progress, the district court justifiably rejected the defendants' contention that they did not have to fund the non-educational portion of the Devereux program because DCYS placed M.M. there for non-educational reasons. We begin by noting that reimbursement for such expenses is appropriate under the IDEA if the court determines that the child's placement was proper. School Comm. of Burlington v. Dept. of Educ., 471 U.S. 359, 370, 105 S.Ct. 1996, 2002-03, 85 L.Ed.2d 385 (1985).
 
 
 41
 The IDEA explicitly provides that in certain cases a state may have to pay for institutionalized care for a handicapped child. See 20 U.S.C. § 1401(a)(16) (defining "special education" as including "instruction ... in hospitals and institutions"). Regulations promulgated under the IDEA require that
 
 
 42
 [i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.
 
 
 43
 34 C.F.R. § 300.302.
 
 
 44
 In Rowley, the Supreme Court determined that only "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction" is the child receiving a " 'free appropriate public education' as defined by the Act." 458 U.S. at 189, 102 S.Ct. at 3042 (emphasis added). While the Court rejected a potential-maximizing standard of what is "appropriate" education for a child, the Court noted that "[t]he Act's use of the word 'appropriate' [ ] seems to reflect Congress' recognition that some settings simply are not suitable environments for the participation of some handicapped children." Id. at 197-98 n. 21, 102 S.Ct. at 3046 n. 21. The Court held that the Act requires "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Id. at 203, 102 S.Ct. at 3049. Accordingly, the Act clearly contemplates the need for the support services provided by such programs as residential placements in some circumstances. In deciding if a school must fund a residential placement, the court must determine whether the child requires the residential program to receive educational benefit. Id.; Abrahamson v. Hershman, 701 F.2d 223, 227-28 (1st Cir.1983).
 
 
 45
 The defendants simply miss the issue by relying on the hearing officer's conclusion that they were not obligated to pay for anything other than the educational portion of M.M.'s residential program because M.M. was placed in that program by DCYS for "non-educational reasons." The hearing officer's conclusion is not derived from a consideration of IDEA's requirements, but from the provisions of Connecticut's law dealing with the duties and power of boards of education to provide special education services. See Conn.Gen.Stat.Ann. § 10-76d(e)(2) (West 1996). Consequently, the "due weight" we ordinarily must give to the state administrative proceedings is not implicated with respect to that conclusion, because it concerns an issue of law; namely, the proper interpretation of the federal statute and its requirements. The fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom, or is required due primarily to emotional problems, does not relieve the state of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated. See McKenzie v. Smith, 771 F.2d 1527 (D.C.Cir.1985) (requiring state to fund residential care for child with severe emotional disabilities, where child required highly structured environment in order to learn). If institutionalization is required due to a child's emotional problems, and the child's emotional problems prevent the child from making meaningful educational progress, the Act requires the state to pay for the costs of the placement. Id. at 1534; Abrahamson, 701 F.2d at 228. See also Vander Malle, 667 F.Supp. at 1039 ("As long as the child is properly educable only through a residential placement, when the medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible for the costs of the residential placement."). As the Third Circuit reasoned, "the concept of education is necessarily broad with respect to [such children]." Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 693 (3d Cir.1981).
 
 
 46
 Based on these principles, the district court properly concluded that even though M.M. was placed in the residential program to deal with her emotional problems and her home-life, the state had to fund the program because it was necessary for M.M. to make educational progress. The evidence shows that M.M.'s behavior was regressing, and that her failure to advance academically was due primarily to her severe emotional problems, which could not be effectively dealt with outside a residential setting. In the face of M.M.'s problems, the state offered no meaningful alternative for her. Accordingly, the defendants were obliged to pay for the entire cost of the residential placement.
 
 III. CONCLUSION
 
 47
 We affirm the district court's ruling granting plaintiff's motion for summary judgment and ordering the defendants to reimburse the plaintiff for the non-educational expenses associated with M.M.'s residential placement at Devereux.