427 F.3d 186
 Andrea CERRA, Parent of Kathryn C., A Disabled Student and Thomas Cerra, Parent of Kathryn C., A Disabled Student Plaintiffs-Appellees,
v.
PAWLING CENTRAL SCHOOL DISTRICT Defendant-Appellant.
Docket No. 04-5370-CV.
 United States Court of Appeals, Second Circuit.
 Argued: May 25, 2005.
 Decided: September 28, 2005.
 
 Rosalee Charpentier, Family Advocates, Inc., Kingston, NY, for Plaintiffs-Appellees Andrea and Thomas Cerra.
 Karen S. Norlander, Girvin & Ferlazzo, P.C., for Defendant-Appellant Pawling Central School District.
 Jay Worona, Latham, NY, for Amicus Curiae New York State School Boards Assoc., Inc.
 Before: CALABRESI, B.D. PARKER, Circuit Judges, MUKASEY, Chief Judge.*
 B.D. PARKER, JR., Circuit Judge.
 
 
 1
 Defendant-Appellant Pawling Central School District ("the District") appeals from a grant of summary judgment by the United States District Court for the Southern District of New York (Brieant, J.) to Plaintiffs-Appellees Andrea and Thomas Cerra ("the Cerras"). The Cerras sued under the Individuals with Disabilities in Education Act ("IDEA" or "the Act") seeking reimbursement for their learning disabled daughter's private school tuition. See 20 U.S.C. § 1401 et seq.
 
 
 2
 The Cerras removed their daughter Kathryn from Pawling High School at the start of the 2002-03 school year after objecting to the District's proposed plan for special education services for her eleventh-grade year. They enrolled Kathryn in the Landmark School, an out-of-state, private residential school, and requested an impartial due process hearing under IDEA to obtain tuition reimbursement. See 20 U.S.C. § 1415(f). After a lengthy hearing, an Impartial Hearing Officer ("IHO") denied their claim and a State Review Officer ("SRO") affirmed the dismissal in a detailed opinion. The Cerras then pursued their claim in district court. Disregarding the findings below, the district court held that the District had violated both the procedural and substantive requirements of IDEA. Accordingly, it granted the Cerras summary judgment and awarded them full tuition reimbursement, as well as attorneys' fees and costs.
 
 
 3
 On appeal, the District argues that the district court erred in concluding that the District failed to comply with IDEA's procedural requirements, and in substituting its own judgment for that of the administrative decision-makers on substantive questions of educational methodology and practice. We agree and reverse the district court's judgment.
 
 BACKGROUND
 
 4
 In January 2001, midway through the school year, the Cerras enrolled Kathryn in Pawling High School, where she completed the ninth grade in the regular education program.[1] In June 2001, Kathryn received a psychological evaluation by Karen Arnhold, a school psychologist. Mrs. Arnhold's report indicated that Kathryn had average overall intelligence, but that she was a "remediated dyslexic" whose "[r]eading comprehension [was] seriously discrepant with grade expectations" and whose "verbal memory [was] mildly disordered." The report also indicated that she had an attention disorder. Consequently, on June 24, 2001, the District classified Kathryn as learning disabled and developed an Individualized Education Program ("IEP") for her for the summer of 2001, as required by IDEA. See 20 U.S.C. § 1414(d).
 
 
 5
 At the end of the summer, Kathryn was given an IEP for the 2001-02 school year. It placed her in the school's regular education program, supplemented by weekly consultant teacher services sessions. See 8 N.Y.C.R.R. § 200.1(m) (defining "consultant teacher services"). These special sessions consisted of group instruction with a student to teacher ratio of up to 5 to 1. The IEP also required "preferential seating" in the classroom and gave Kathryn twice the amount of time to take tests.
 
 
 6
 On October 23, 2001, the District's Committee on Special Education ("CSE") held a meeting with Mrs. Cerra in attendance to discuss and revise Kathryn's 2001-02 IEP based on a report by Dr. Ronda Facchini, who had conducted a neuropsychological evaluation of Kathryn at her parents' request. Dr. Facchini's report concluded that "Kathryn [would] be most appropriately educated in a specialized school for children with learning issues" and noted that she "should be engaged in psychotherapy to aid her emotional development." The CSE determined that Kathryn could "successfully progress in the regular classroom with modifications and support in skill development," but amended the 2001-02 IEP to provide one-on-one tutorials two days a week after-school instead of consultant teacher services. The revised IEP also added after-school educational counseling sessions two days a week.
 
 
 7
 While Kathryn availed herself of these services in November and early December, she did not attend the tutoring or counseling sessions from December 15, 2001 through March 20, 2002.[2] Consequently, members of the CSE met with the Cerras in March to develop a more workable program. Without formally amending Kathryn's IEP, it was decided that Kathryn would stop attending one-on-one tutoring and counseling sessions at the elementary school, and instead would resume consultant teacher services at the high school in a small group setting. Kathryn attended the small-group sessions through most of May, except during a short period when her mother told her not to go because of a dispute with her teacher.
 
 
 8
 On May 17, 2002, seventeen days before the school year ended, the District's Director of Special Education, Althea Schepperly, convened a meeting with Mrs. Cerra and some of Kathryn's teachers and counselors to make short-term plans to help Kathryn pass the Regents exams. The group discussed Kathryn's reading comprehension difficulties and arranged for her to be tutored daily during lunch and after-school.
 
 
 9
 On June 14, 2002, the CSE held its annual review of Kathryn's educational program, with Mrs. Cerra in attendance. The group first discussed Kathryn's fourth quarter grades, all of which were passing, but very low. Mrs. Cerra expressed that she believed the poor grades showed that Kathryn had regressed during the year and that the CSE needed "to come up with a better plan." The group then discussed Kathryn's 2002-03 IEP. The CSE proposed offering Kathryn one period of resource room instruction and one period of a special reading class each day, both of which would have 5 to 1 student-teacher ratios. See 8 N.Y.C.R.R. § 200.1(rr) (defining resource room program"). The CSE also recommended study guides, class notes, an additional set of textbooks, testing modifications, and preferential seating away from social peers. Mrs. Cerra requested that she and her husband be sent Kathryn's new IEP early in the summer so that they would have an opportunity to review it.
 
 
 10
 Near the end of the meeting, Kathryn's consultant teacher, Mrs. Schreiber, provided Mrs. Cerra with a draft copy of the goals and objectives for Kathryn's proposed 2002-03 IEP. Mrs. Schreiber explained that she was providing the draft so that "when you do get the IEP over the summer, you can check it against what I submitted here today in June." The draft was apparently coded in a confusing way, leading Mrs. Cerra to say, "[i]t's all Greek to me." Mrs. Schreiber explained that the final IEP would not be coded and also reiterated that the draft was only intended to provide an advance copy of the objectives that she could compare with the IEP when she received it.
 
 
 11
 Over the summer, the Cerras sent several letters to the School District requesting the IEP and also asking for class profiles for the proposed reading class and resource room sessions, which would identify the other students in the classes. Having not yet received the IEP, on August 19 and 20, 2002, Appellees sent letters to the District requesting an impartial hearing pursuant to IDEA, informing the District that they were enrolling Kathryn in the Landmark School, a private residential school in Massachusetts, and demanding reimbursement for tuition, legal fees, expenses, associated costs and transportation.[3] See 20 U.S.C. § 1415(f).
 
 
 12
 On August 23, 2002, the District advised the Cerras that the CSE had appointed an IHO, but that "in an effort to avert unnecessary litigation," it had scheduled a meeting on September 3, 2002 — one day before the first day of school — to review and reconsider the CSE's recommendations for the 2002-03 IEP. The District mailed Kathryn's IEP to the Cerras on August 29, 2002. Mr. Cerra requested that the September 3rd meeting be rescheduled for September 12th, at which time he informed the District that he would save his objections to the IEP for the impartial hearing.
 
 
 13
 The impartial hearing began on September 18, 2002 and ultimately ended on March 7, 2003 — after ten days of testimony scatted sporadically throughout this nearly six-month time period, eleven witnesses, and approximately 2300 transcript pages. The Cerras argued that the School District had violated the procedural requirements of IDEA by failing to provide the 2002-03 IEP in a timely fashion, disregarding their requests for class profiles, and generally failing to provide them a "meaningful opportunity to participate in the formulation of the IEP." They also argued that the IEP was substantively inadequate for a variety of reasons. By contrast, they contended, the curriculum at Landmark School met Kathryn's educational needs for a variety of reasons.
 
 
 14
 The IHO rejected Plaintiffs' claims and found in favor of the District. First, the IHO found that the District had not violated the procedural requirements of the IDEA because it had provided the Cerras with Kathryn's IEP and scheduled a meeting about the IEP before the school year began. In addition, the IHO found, the District had "offered the parents of [Kathryn] an adequate, free and appropriate public school placement" for the 2002-03 school year. The IHO also held that the Cerras were not entitled to reimbursement because they had failed to demonstrate that Landmark School, a residential school 200 miles from the Cerras' home, would provide Kathryn with an appropriate education in the "least restrictive environment."
 
 
 15
 The SRO affirmed in a lengthy, detailed opinion. Citing the Cerras' participation at several planning meetings, the SRO first found that their procedural rights under IDEA were adequately protected because the parents were "significantly involved" in developing Kathryn's educational program. The SRO also found that the IEP was "both adequate and appropriate," that it was likely to produce progress, and that Kathryn had made progress on her 2001-02 IEP goals and objectives when she took advantage of the services offered to her. Tellingly, the SRO also noted that "the student's attendance at sessions designed to provide extra assistance was sporadic despite respondent's efforts to accommodate student and parent preferences while addressing the student's needs."
 
 
 16
 The Cerras then appealed to the district court, which, on the un-supplemented record below, granted them summary judgment. The district court found that the District had violated IDEA's procedural requirements by "fail[ing] to provide Plaintiffs with the requested documents concerning [Kathryn's] proposed classes, and [failing] to provide the IEP in a timely fashion." The court also found that the IEP was substantively inadequate because it was "not `likely to produce progress' nor confer any `meaningful benefit' upon Kathryn." "Because of the combination of procedural and substantive inadequacies in the 2002-03 IEP," the district court concluded, it could not be sure that "Kathryn would have been provided with a `free appropriate public education.'" The district court further found that the IHO had erred in focusing on whether the Landmark School was the least restrictive environment. Accordingly, it awarded tuition reimbursement and attorneys' fees and costs to the Cerras.
 
 
 17
 The District appeals.
 
 DISCUSSION
 
 18
 We review de novo the district court's award of summary judgment. See M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 102 (2d Cir.2000). Whether the district court correctly applied the IDEA's statutory and regulatory provisions to the facts of a particular case is a mixed question of law and fact, which we also review de novo. See J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 64 (2d Cir.2000).
 
 
 19
 In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy. See generally Bd. of Educ. v. Rowley, 458 U.S. 176, 205-08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (discussing the nature of federal judicial review of administrative decisions in IDEA cases). Although the district court must engage in an independent review of the administrative record and make a determination based on a "preponderance of the evidence," Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir.1997), the Supreme Court has cautioned that such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206, 102 S.Ct. 3034. As our Court has explained, "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give `due weight' to these proceedings, mindful that the judiciary generally `lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir.1998) (quoting Rowley, 458 U.S. at 206, 208, 102 S.Ct. 3034) (some internal quotations omitted).
 
 
 20
 To receive federal funding under IDEA, a state must, among other things, provide all children with disabilities with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). "When a state receiving IDEA funding fails to give a disabled child such an education, the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." M.S., 231 F.3d at 102 (citing Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).
 
 
 21
 To determine whether parents who sue under IDEA to challenge a proposed IEP are entitled to private school tuition reimbursement, we engage in a three step process. The first two steps focus on whether the "proposed IEP was inadequate to afford the child an appropriate public education." Walczak, 142 F.3d at 129 (citing Burlington, 471 U.S. at 370, 105 S.Ct. 1996). First, we examine whether the state has complied with the procedures set forth in the IDEA. See Walczak, 142 F.3d at 129. Second, we consider whether the IEP developed through the Act's procedures "[is] `reasonably calculated to enable the child to receive educational benefits.'" Id. (quoting Rowley, 458 U.S. at 206-07, 102 S.Ct. 3034). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Rowley, 458 U.S. at 207, 102 S.Ct. 3034. If, however, the IEP is procedurally or substantively deficient, we proceed to the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs. See Walczak, 142 F.3d at 129.
 
 
 22
 Here, the District and amicus argue that the district court erred at each step of the analysis. Because we conclude that the District complied with the IDEA's procedural and substantive requirements, we need not reach the third step.
 
 
 23
 I. Compliance with IDEA's Procedural Requirements
 
 
 24
 In considering whether the District fulfilled IDEA's procedural obligations, we focus on whether the Cerras had an adequate opportunity to participate in the development of Kathryn's IEP. To ensure parental participation, the Act requires, inter alia,
 
 
 25
 [a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.
 
 
 26
 20 U.S.C. § 1415(b)(1). The regulations governing parental participation provide that "[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate[.]" 34 C.F.R. § 300.345(a). The regulations go on to state that "[t]he public agency shall give the parent a copy of the child's IEP at no cost to the parent." 34 C.F.R. § 300.345(f). "[T]he importance Congress attached to these procedural safeguards cannot be gainsaid." Rowley, 458 U.S. at 205, 102 S.Ct. 3034.
 
 
 27
 The district court concluded that the proposed IEP for Kathryn's 2002-2003 school year was procedurally inadequate because the District "fail[ed] to provide Plaintiffs with the requested documents concerning her proposed classes, and [failed] to provide the IEP in a timely fashion which would have afforded Plaintiffs an opportunity to evaluate the proposed program." By contrast, the SRO found that IDEA's procedural requirements were satisfied because the Cerras were "significantly involved" in developing Kathryn's special education plans, as evidenced by Mrs. Cerra's participation at the May 17, 2002 and June 14, 2002 meetings. The SRO noted that the transcripts of the two meetings reflected that Mrs. Cerra actively participated in discussing Kathryn's needs, the goals of her 2001-02 and 2002-03 IEPs, and her teachers' concerns.
 
 
 28
 We agree with the SRO that the District fulfilled the Act's procedural obligations. The Cerras had numerous opportunities to "participate in meetings with respect to the identification, evaluation, and educational placement of the child" throughout the 2001-02 school year, as well as in preparation for the 2002-03 school year. 20 U.S.C. § 1415(b)(1). In addition to attending meetings on October 23, 2001, March 20, 2002 and May 17, 2002, Mrs. Cerra participated actively in the June 14, 2002 CSE meeting, which was specifically focused on developing Kathryn's 2002-03 IEP. The transcript of that meeting shows that the group discussed Kathryn's educational progress, her health, and the goals and objectives she should be achieving, and that Mrs. Cerra was frequently consulted for input about the CSE's proposed plan. Moreover, as soon as the District found out that the Cerras intended to send Kathryn to a private residential school, it scheduled another meeting to discuss the IEP before the school year began.
 
 
 29
 Although the district court acknowledged Mrs. Cerra's participation in the June 14, 2002 meeting, it suggested that her participation in that meeting was not "meaningful" because she could not understand the "coded" document Mrs. Schreiber gave her toward the end of the meeting. The U.S. Department of Education has instructed that when a school district "bring[s] drafts of some or all of the IEP content to the IEP meeting, [the relevant inquiry is whether there was] a full discussion with the child's parents, before the child's IEP is finalized, regarding drafted content and the child's needs and the services to be provided to meet those needs." 34 C.F.R. § 300, App.A—Notice of Interpretation, Question 32. When Mrs. Schreiber gave Mrs. Cerra the draft document near the end of the meeting—after a lengthy discussion of Kathryn's past performance and future goals—the teacher explained that she was giving her the draft so that she could compare it against the final IEP later in the summer. The document was clearly given to Mrs. Cerra as a supplement to the discussion and the IEP, not in place of either one. Under these circumstances, we are satisfied that Mrs. Cerra's participation in the meeting was meaningful despite her initial confusion about the draft.
 
 
 30
 The district court also faulted the District for failing to provide the IEP in a timely fashion. However, the Cerras have not directed us to any statutory provision or regulation requiring that an IEP be produced at the time parents demand. Instead, school districts must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy. See 34 C.F.R. § 300.342(a) ("At the beginning of each school year, each public agency shall have an IEP in effect for each child with a disability within its jurisdiction."); 34 C.F.R. § 300.345(f) ("The public agency shall give the parent a copy of the child's IEP at no cost to the parent."). Although the Cerras might have preferred to receive the IEP sooner, and we are sympathetic to the frustration they undoubtedly felt in not receiving it sooner despite repeated requests, the District fulfilled its legal obligations by providing the IEP before the first day of school.[4]
 
 
 31
 The District also was not obligated to provide student profiles for Kathryn's special education classes, particularly when they did not yet exist. Unlike an IEP, the Act's statutory and regulatory provisions do not expressly require school districts to provide parents with class profiles. The district court indicated that the District's failure to provide the profiles violated the requirement that parents have an opportunity to "[i]nspect and review all education records with respect to (i)[t]he identification, evaluation, and educational placement of the child; and (ii)[t]he provision of [a free appropriate public education] to the child." 34 C.F.R. § 300.501(a)(1). However, the Act defines "education records" as those records that "contain information directly related to a student" and "are maintained by" the school district. 20 U.S.C. § 1232g(a)(4)(A). The Cerras requested the class profiles in a letter dated June 19, 2002, but as Ms. Schepperly testified during the impartial hearing, she would not have determined class groupings and prepared class profiles until the end of August. Consequently, the class profiles were not "maintained" by the District at the time the Cerras requested them, and thus do not fall within § 1232g(a)(4).[5] For these reasons, we cannot conclude that the District defaulted on its procedural obligations by failing to provide the requested profiles.
 
 
 32
 In sum, given Mrs. Cerra's extensive participation in the June 14, 2002 meeting and the District's compliance with the requirement of providing an IEP before the first day of the 2002-03 school year, we are satisfied that it fulfilled IDEA's procedural obligations. While the Cerras may have been dissatisfied by the District's slow pace, we cannot conclude that they were denied a meaningful opportunity to participate in the formulation of their daughter's IEP.
 
 II. Substantive Adequacy of the IEP
 
 33
 Under Rowley, a school district complies with IDEA's substantive requirements if a student's IEP is "reasonably calculated to enable the child to receive educational benefit[s]." Rowley, 458 U.S. at 207, 102 S.Ct. 3034. A school district is not, however, required to furnish "every special service necessary to maximize each handicapped child's potential." Id. at 199, 102 S.Ct. 3034; see Carlisle Area Sch. v. Scott P., 62 F.3d 520, 534 (3d Cir.1995) (school districts "need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a `basic floor of opportunity'") (quoting Rowley, 458 U.S. at 201, 102 S.Ct. 3034), cited in Walczak, 142 F.3d at 132. Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is "likely to produce progress, not regression," and if the IEP affords the student with an opportunity greater than mere "trivial advancement." Walczak, 142 F.3d at 130 (quotations omitted).
 
 
 34
 In order to avoid "`impermissibly meddling in state educational methodology,'" a district court "must examine the record for any `objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." Id. (quoting Mrs. B., 103 F.3d at 1121). Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy. See, e.g., M.S., 231 F.3d at 105 ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where ... the district court's decision was based solely on the record that was before the SRO."). We have not hesitated to vacate district court opinions where the district court "erred in substituting its judgment for that of the agency experts and the hearing officer." Briggs v. Bd. of Educ., 882 F.2d 688, 693 (2d Cir.1989); see also Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir.2003) ("[I]n violation of Rowley, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy — effective methods of educating dyslexic students — in direct contradiction of the opinions of state administrative officers who had heard the same evidence."); M.S., 231 F.3d at 105 ("We believe the district court thus inappropriately substituted its own subjective judgment about what are appropriate measures for educational progress.").
 
 
 35
 Here, the district court cited three reasons why it believed the proposed 2002-03 IEP "was not likely to produce progress nor confer any meaningful benefit upon Kathryn." First, the court noted that the IEP did not provide for one-on-one instruction, even though one of Kathryn's teachers had "indicated the importance of and the likelihood of success when tutoring Kathryn one on one as compared to group tutoring." Second, the court expressed doubt that Kathryn's passing grades were evidence that she had actually mastered the material she was taught because her grades were also based on class participation and homework completion. Third, the district court observed that the 2002-03 IEP failed to provide Kathryn with any counseling sessions, even though Mrs. Cerra had informed the District that Kathryn felt stressed and overwhelmed.
 
 
 36
 The District argues that the district court erred in substituting its judgment for that of the SRO, which specifically addressed the three issues cited by the district court. The SRO was satisfied that "small group instruction two periods per day" — which took the place of one-on-one sessions in the 2002-03 IEP — was "designed to support content area subjects, and would have provided skills training as well as support and instruction in compensatory strategies." The SRO also determined that there was evidence in the record that Kathryn had made progress in 2001-02, despite the fact that her 2001-02 IEP was not fully implemented since her attendance was sporadic. The SRO cited not just her passing grades, but also "[p]rogress reports," "teacher testimony," and "formal evaluation reports" that showed she had made progress. Finally, the SRO found that the proposed IEP adequately accounted for Kathryn's emotional and psychological needs even though it discontinued counseling because (1) "[t]he record indicate[d] that the student's reported anxiety and emotional distress were not observed in school," (2) "petitioners did not advise respondent that their daughter was receiving counseling for anxiety or depression," and (3) any counseling that had been provided in the 2001-02 IEP "was being provided to address her organizational and cognitive deficits rather than social and emotional concerns."
 
 
 37
 We agree with the District that the district court failed to give "due weight" to the SRO's lengthy, reasoned opinion. Rowley, 458 U.S. at 206, 102 S.Ct. 3034. As a preliminary matter, "[d]eference is particularly appropriate when, as here, the state hearing officers' review has been thorough and careful." Walczak, 142 F.3d at 129. Furthermore, the district court's determination that Kathryn was unlikely to make progress under the proposed IEP is precisely the kind of educational policy decision a district court may not make absent objective evidence in the record suggesting that the SRO has reached an erroneous conclusion. See M.S., 231 F.3d at 105. Although the district court minimized the significance of Kathryn's passing grades, we have expressly held that when a learning-disabled child is in a mainstream class, "the attainment of passing grades and regular advancement from grade to grade" will generally constitute evidence of satisfactory progress. Walczak, 142 F.3d at 130. Furthermore, the SRO's finding that Kathryn could make progress under the proposed IEP was based on more than simply her low but passing grades. The SRO noted, for example, that Kathryn's inconsistent use of the services provided to her under the 2001-02 IEP might have affected her performance and that she could make more progress in the future with regular attendance. The district court, by contrast, failed to take into account the shared belief among Kathryn's teachers and other professionals that her poor performance was due largely to her inconsistency in accessing special education services.
 
 
 38
 The district court's other conclusions are also not supported by sufficient evidence to justify rejecting the SRO's reasoned findings. The district court emphasized the importance of one-on-one tutoring because it found that "[d]uring the May 17, 2002 meeting, Kathryn's teacher indicated the importance of and the likelihood of success when tutoring Kathryn one on one as compared to group tutoring." Even if it were appropriate for the district court to focus on a single comment in a voluminous record, Mrs. Schreiber's remarks, read in context, do not support the district court's conclusion. Rather than comparing the benefits of one-on-one work to group tutoring generally, Mrs. Schreiber was simply observing that Kathryn did well on her Math Regents after receiving one-on-one tutoring over the summer. In fact, Mrs. Schreiber made clear that she thought "a reading program with no more than five students" was adequate.
 
 
 39
 The district court also concluded that the proposed IEP was deficient because it failed to provide counseling services even though Dr. Facchini had concluded that "Kathryn should be engaged in psychotherapy to aid her emotional development." However, the SRO was justified in finding that the record suggests otherwise. Kathryn's teachers uniformly testified at the hearing that she came across as a bubbly, social, and relaxed teenager, and Mrs. Arnhold, the school psychologist, testified that she knew of "nothing" to "support the fact that [Kathryn] had any type of a serious mental problem or disorder at that time." Moreover, school officials testified that the Cerras had not told the school that she was being treated for anxiety or depression. Accordingly, we see no reason for the district court to have substituted its judgment for that of the SRO.
 
 CONCLUSION
 
 40
 For all of these reasons, we conclude that the District complied with IDEA's procedural and substantive requirements. Accordingly, we reverse the judgment below and remand to the district court with instructions to enter judgment in favor of the District.
 
 
 
 Notes:
 
 
 *
 The Honorable Michael B. Mukasey, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Kathryn had previously attended the Pawling public schools in elementary school and was first diagnosed with learning disabilities in fourth grade. Her parents later moved her to private schools for middle school, and she returned to the District in the ninth grade
 
 
 [2]
 The tutoring and counseling sessions took place at a nearby elementary school. There were several factors that contributed to Kathryn's poor attendance: Her parents signed her up for driver's education sessions one to two afternoons per week, she attended preparatory classes for the Regents' exam after school at the high school, and she had low blood pressure, which caused her to miss school and have to attend after-school doctors' appointments. Although Mr. Cerra claimed at the hearing that Kathryn missed the sessions because the School District failed to make transportation available from the high school to the elementary school, the IHO properly discredited this testimony
 
 
 [3]
 Kathryn's twin sister also attended Landmark School, and on appeal the Cerras argue that because the District reimbursed them for their other daughter's tuition, it must reimburse them for Kathryn's tuition because the two girls have "identical needs." However, the record indicates that Kathryn's twin has been identified as "severely dyslexic" and suffered in the past from a seizure disorder, for which she underwent a frontal lobectomy. By contrast, Kathryn has been described as a "remediated dyslexic" and has never had a seizure disorder. The IHO ruled that testimony about Kathryn's twin was irrelevant to the hearing and precluded testimony about her. We agree and thus focus on the adequacy of Kathryn's IEPs without reference to her sister's educational needs
 
 
 [4]
 We also note that the District offered a reasonable explanation for its failure to accommodate the Cerras' request to receive the IEP earlier in the summer. Ms. Schepperly testified at the impartial hearing that she had 200 IEPs to prepare over the summer, that she was short-staffed, and that the School District was in the process of switching computer systems. While all of the IEPs were finished before the start of the school year — her duty under the law — she could not provide all of them at the earliest time demanded by the parents
 
 
 [5]
 We note, moreover, that even if the Cerras were not provided with actual class profiles, the transcript of the June 14, 2002 meeting shows that Mrs. Cerra had an opportunity to discuss with the CSE how Kathryn's classroom grouping would ultimately be developed